# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| RODNEY J. JOHNSON, | : | Bankruptcy No. 04-35404DWS |
| Debtor. | : | |
| | : | |
| RODNEY J. JOHNSON, | : | Adversary No. 05-0341 |
| Plaintiff, | : | |
| v. | : | |
| GREEN TREE CONSUMER DISCOUNT COMPANY, f/k/a Conseco Finance Service Corporation, U.S. BANK TRUST N.A. as Trustee for Conseco Finance Home Equity Loan Trust 2001-C, | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the court is the Motion for Summary Judgment (the "Motion") of defendant U.S. Bank, N.A., as Trustee for Conseco Finance Home Equity Loan Trust 2001-C ("US Bank").[1] For the reasons stated herein, the Motion is granted.

---

[1] US Bank, improperly named as U.S. Bank *Trust*, N.A., is the only remaining defendant. The Complaint was dismissed as to Defendant Green Tree Consumer Discount Company by Order dated October 4, 2005.

**FACTUAL AND PROCEDURAL BACKGROUND**[2]

On July 16, 2001 Debtor/Plaintiff Rodney Johnson ("Debtor") entered into a loan transaction with Conseco Finance Discount Company ("Conseco") for the principal amount of $58,149.03 with an interest rate of 11.5% (the "Refinance Loan"). Joint Pretrial Statement, Statement of Uncontested Facts ("Uncontested Facts") ¶ 5. The Refinance Loan paid off an existing mortgage on Debtor's home, a car loan, credit card debt, and a preexisting loan to Conseco in the amount of $5,500. Id.; HUD Settlement Sheet, Exhibit C to the Motion.

The sequence of events leading up to the Refinance Loan is not entirely clear on this record and would not likely be clarified at trial. Debtor is the only witness identified on the Joint Pretrial Statement with knowledge of the facts surrounding the Refinance Loan. At his deposition he testified that old injuries and medication he was taking have impeded his memory. Deposition of Rodney Johnson ("Johnson Dep.") at 11. Consistent with his admission, Debtor's recollection of his interactions with Conseco was spotty. He could not

---

[2] To the extent that some documents on this record are not supported by affidavit, neither party has raised an objection. "As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles A.Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure §2722, at 384 (1998). Accord Johnson v. United States Postal Service, 64 F.3d 233, 237 (6th Cir. 1995) (ruling that the "failure to object to evidentiary material submitted in support of a summary judgment motion constitutes a waiver of those objections."); H. Sand & Co., Inc. v. Airtemp Corporation, 934 F.2d 450, 454-55 (2d Cir. 1991) (Rule 56 does not require parties to authenticate documents "where appellee did not challenge the authenticity of the documents in the district court."); Dautremont v. Broadlawns Hospital, 827 F.2d 291, 294-95 (8th Cir. 1987) (affirming summary judgment where appellant failed to object in district court to its consideration of documents not in compliance with Rule 56 and failed to demonstrate that district court's consideration of documents constituted reversible error); Giovacchini v. Perrine (In re Giovacchini), 1995 WL 80102, at *3 n.1 (E.D. Pa. Feb. 27, 1995) (citing Federal Practice and Procedure §2722) (holding that unauthenticated medical reports would be considered in ruling on motion for summary judgment since no objection was raised thereto).

identify persons with whom he spoke and he appeared confused with respect to which loan transaction he was discussing.

It appears from the questions of counsel at Debtor's deposition that Debtor originally financed the purchase of windows from his home on January 9, 2001 (the "Window Loan").[3] Id. at 31-33, 35-37. Debtor evidenced no independent recollection of this fact and indeed did not realize until that moment that Conseco rather than Sears financed that purchase. Id. at 31. While he remembers having a telephone discussion with someone from Conseco after purchasing his windows he could not pinpoint the date of his discussion. Once his counsel showed him the Window Loan documents and told him they were dated January 9, Debtor said Conseco contacted him "not too long" after that but in any case no more than six months later. Id. at 37-38. Debtor did not provide details as to the substance of the telephone discussion other than "he said that they can give me a better loan to pay for the windows. Because that's all I wanted to get done, was just pay for the windows." Id. at 33.

To further add to Debtor's confusion, he was shown documents relating to a loan application with Conseco on or about January 31, 2001 that he appeared to have cancelled before it went to a closing (the "Aborted Loan"). Johnson Dep. at 72-76, 83-89. Debtor had absolutely no recollection of that transaction though he verified his signature on the documents, which were not included in this summary judgment record. Id. Neither party's counsel elicited testimony from Debtor specifying that his telephone discussion with Conseco

---

[3] While the documents pertaining to the original window loan were discussed at Debtor's deposition, they were not placed into the summary judgment record. Id. at 37.

was with respect to the Refinance Loan as opposed to the Aborted Loan. Debtor's testimony makes clear that he simply cannot remember. Id.

Nevertheless, the parties have stipulated that Debtor understood Conseco was conditioning the Refinance Loan on his agreement to refinance his first mortgage, notwithstanding that he only wanted to pay off the Window Loan. Knowing this, Debtor agreed to proceed with the Refinance Loan. Undisputed Facts ¶¶ 12-14.

Closing for the Refinance Loan took place on July 16, 2001 at approximately 7:00 p.m. at Debtor's home. Only Debtor and an unidentified closing agent were present.[4] Uncontested Facts ¶¶ 5, 22. Debtor was presented with numerous documents to sign, though he has no recollection of what those documents were. In any case, Debtor alleges that he cannot read, and that he cannot write anything other than his name. For the purposes of the Motion, US Bank assumes this assertion to be true. However, Debtor also admits that he did not disclose his illiteracy either to the Conseco representative he spoke to on the phone or the closing agent who showed up at his home, explaining that he was too embarrassed to do so. Johnson Dep. at 26-29. Nor did he enlist any family member or friend to attend the closing to help him as he has done in the past. Uncontested Facts ¶¶ 23-25; Johnson Dep. at 25-26.

---

[4] While the identity of the closing agent is unclear, the parties agree that it was not a representative of US Bank and that US Bank was not involved in the origination of the Refinance Loan. Uncontested Facts ¶¶ 26-27. Debtor apparently possesses the business card of an individual from Conseco named Roddy Gaymon, not included in the summary judgment record. Johnson Dep. at 58. However, Debtor cannot state with any degree of certainty that Gaymon was the closing agent or the person he spoke to over the phone. Johnson Dep. at 27-29; Plaintiff's Response to Defendant's First Set of Interrogatories ("Pls. Interrog.") No. 1. Debtor's memorandum asserts that the persons at the closing were Debtor and a Edward J. Ratagan. However, the cited deposition page makes no mention of Ratagan, nor did I see any mention of such a person in several readings of the entire transcript.

Every time the closing agent presented a document for signature Debtor would ask what he was signing. The closing agent would simply answer each time, "it's for the loan." Pls. Interrog. No. 3; Johnson Dep at 27-28.

There is no disagreement that among those documents presented to Debtor were a Truth-In-Lending Disclosures statement (the "TILA Statement") and a HUD Settlement Statement. Exhibits C and F to Motion; Exhibit B to Complaint. At the bottom of the TILA Statement is a section which informs the borrower that "Credit life insurance and credit disability insurance is not required to obtain credit and will not be provided unless I sign and agree to pay the additional costs." Exhibit E to Motion. Underneath this disclosure are boxes where the borrower has the option of checking "I do" or "I do not" want various types of credit insurance. The "I do" box for credit life insurance bears a typewritten "x," indicating that such insurance is desired.[5] Debtor verified his signature underneath this box. Johnson Dep. at 55. Debtor was charged a premium of $2,149.03 for credit life insurance. HUD Settlement Sheet, Exhibit C to the Motion. Debtor has no recollection of someone from Conseco asking him if he wanted insurance. Pls. Interrog. No. 11.

The summary judgment record also contains two identical documents titled "Application for Credit Insurance" dated July 16, 2001 and bearing Debtor's signature. Johnson Dep. at 77-80; Exhibit G to Debtor's Mem. Each application has five questions with boxes to check off "yes" or "no" as to whether the applicant: (1) is 65 years or older; (2)-(3) has been treated for various illnesses/conditions; (4) is working less than 30 hours per

---

[5] The other insurance options bear either a typewritten "x" in the "do not want" box or a typed "n/a".

week or 9 months out of the year; and (5) is receiving disability benefits or has consented to medical treatment that would disable the applicant. The applications indicate that if Question Nos. 1 and 2 are answered "yes" life coverage must be denied. Debtor has no recollection of being asked these questions by the closing agent. Johnson Dep. at 61.

The two applications diverge in how they were answered and treated by the insurer. The first application bears a handwritten "x" in each question's "YES" box and bears the stamps "Received- Jul 19 2001- WSC" and "DECLINED." This version of the application was subsequently mailed back to Debtor. Johnson Dep. at 77. The second application, which appears to have been produced from the records of the loan servicer (Bates Stamp GT0019), bears a handwritten "x" in each question's "NO" box. This application bears no stamps indicating denial.

On or about August 1, 2001 the Refinance Loan was assigned to the Conseco Finance Equity Loan Trust 2001-C, for which US Bank is the trustee. Affidavit of Dominc Baglio ¶¶ 3-4, Exhibit D to Motion. The parties agree that US Bank was not involved in the origination of the Refinance Loan, that no employee of US Bank was present at the loan closing, and that Debtor did not rely on any statements by or actions of US Bank. Uncontested Facts ¶¶ 26-28. Rather, as discussed below, Debtor relies upon principles of law to extend liability to US Bank for Conseco's conduct.

**DISCUSSION**

A motion for summary judgment is governed by Federal Rules of Civil Procedure 56, applicable in this proceeding pursuant to Federal Rule of Bankruptcy 7056. Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment must overcome the initial burden of demonstrating the absence of a material question of fact. Celotex v. Catrett, 477 U.S. 317, 325 (1986). The substantive law will determine which facts are material. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Id. at 255. A court must find that the motion alleges facts which, if proven at trial, would require a directed verdict. 6 J. Moore, Moore's Federal Practice, ¶ 56.26 (2d ed. 1988). If so, the respondent "must set forth specific facts showing there is a genuine issue for trial," and may not "rest upon the mere allegations or denials of the pleading." Fed. R. Civ P. 56(e). If the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgement may be granted. Anderson, 477 U.S. at 250. The absence of a genuine issue for trial is evident where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. Mashusita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A. Truth in Lending Claim (Counts I and II)

Debtor's claims under these counts are based upon the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. I therefore begin with some statutory background. TILA is a federal statute governing the terms and conditions of consumer credit. Its purpose is to aid unsophisticated consumers lest they be easily misled as to the costs of financing. Shepeard v. Quality Siding & Window Factory, 730 F.Supp. 1295, 1299 (D. Del.1990). To that end, TILA and the regulations promulgated thereunder require certain disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uniformed use of credit. Id.

In 15 U.S.C. § 1604, Congress authorized the Federal Reserve Board to "prescribe regulations to carry out the purposes" of TILA. Pursuant to this authority, the Federal Reserve Board promulgated "Regulation Z," which is memorialized in 12 C.F.R. § 226. Rossman v. Fleet Bank (R.I.) National Association, 280 F.3d 384, 389 (3d Cir.2002). The Board "also published extensive 'Official Staff Interpretations.' 12 C.F.R. Pt. 226, Supp. I." Id. The Supreme Court has instructed that "[c]ourts should honor that congressional choice. Thus, while not abdicating their ultimate judicial responsibility to determine the law. . . judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational." Ford Motor Credit Company v. Milhollin, 444 U.S. 555, 568, 100 S.Ct. 790 (1980). See also Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219, 101 S.Ct. 2266 (1981) ("absent some obvious repugnance to the statute, 'Regulation Z' should be accepted by the courts, as should the Board's interpretation of its own regulation"). In analyzing the Debtor's contentions, my

guideposts are therefore the statutory provisions of TILA as well as Regulation Z and the Official Staff Interpretations.

Pursuant to TILA, a lender must disclose, as a "finance charge," all of those charges "payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.. . ." 15 U.S.C. § 1605(a). The statute mandates the inclusion of credit life insurance as part of the "finance charge," subject to the following exception:

> Charges or premiums for credit life, accident, or health insurance written in connection with any consumer credit transaction shall be included in the finance charges unless
>
> (1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and
>
> (2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof.

15 U.S.C. § 1605(b); accord 12 CFR 226.4(d).

The Official Staff Interpretations further clarify:

> Credit life, accident, health, or loss-of-income insurance must be voluntary in order for the premium or charges to be excluded from the finance charge. Whether the insurance is in fact required or optional is a factual question. If the insurance is required, the premiums must be included in the finance charge, whether the insurance is purchased from the creditor or from a third party.

12 C.F.R. § 226, Supp I., ¶ 226.4(d)5.

The Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 ("HOEPA"), is an amendment to TILA and requires that with regard to certain mortgages (a "HOEPA Mortgage"), additional disclosures must be made beyond those that are required by TILA generally. 15 U.S.C. § 1639 ("HOEPA Disclosures"). See also Solar v. Millenium Financial, Inc., 2002 WL 1019047, at *3 n. 4 (E.D. Pa.2002). A HOEPA Mortgage is a "mortgage referred to in section 1602(aa) of this title." 15 U.S.C. § 1639(a)(1). That section in turn defines a HOEPA Mortgage as one which, *inter alia*, the "points and fees" exceed 8% of the loan amount. 15 U.S.C. § 1602(aa)(1)(B). Points and fees include "all items included in the finance charge." 15 U.S.C. § 1602(aa)(4)(A).

The parties agree that the credit insurance premium was not included in the "finance charge" for the Refinance Loan. The parties further agree that, absent inclusion of the insurance premium, the points and fees for the Refinance Loan do not cross the 8% threshold for a HOEPA Mortgage. The dispositive issue therefore is whether Debtor voluntarily chose to purchase the insurance so as to properly exclude it from the finance charge for TILA and HOEPA purposes.[6]

The TILA Statement provided to Debtor at the closing bears a clear declaration that insurance is not a requirement for the Refinance Loan, i.e that it is voluntary. Debtor cites to Milbourne v. Mid-Penn Consumer Discount Co. (In re Milbourne), 108 B.R. 522 (Bankr. E.D. Pa. 1989), which held that, notwithstanding such a signed declaration, TILA liability can be found where there is evidence that a lender "affirmatively represented, by words or

---

[6] US Bank also raises certain defenses it asserts are available to it as an assignee of the Refinance Loan. Because I find no TILA or HOEPA violation with respect to the original transaction, I need not address whether US Bank is insulated by assignee status.

by conduct, that insurance was in fact required." Id. at 541. Debtor asserts that Conseco and its closing agent represented that the insurance was required by: (1) failing to ask him if he wanted insurance during the application process or at closing; (2) simply presenting without explanation the TILA Statement with its pre-selected insurance option and the insurance applications, and (3) responding "it's for the loan" each time Debtor questioned a document.

The lender in Milbourne, like Conseco, also included insurance as part of the loan transaction notwithstanding that the borrowers did not affirmatively request it. And like Conseco, that lender's agents did not explain insurance options to the borrowers. The court stated:

> We recognize that borrowers are often overwhelmed when they are in the process of making loans and that they are therefore very susceptible to suggestions from lenders regarding inclusion of specific terms which are "recommended" by the lenders. . . . As the court stated in Mims, supra, 426 F.Supp. at 632, "it is natural for anyone, ⋯ who wants to borrow money to be unwilling to displease the lender over a small matter." Nevertheless, the . . . borrower's assumption that credit insurance is required does not establish that the lender is requiring the borrower to purchase insurance. Id.

108 B.R. at 542. In Mims v. Dixie Finance Corp., 426 F. Supp. 627, (D.C. Ga. 1976), upon which Milbourne relies, the court held that the borrower could not prove her case "unless she asks whether the insurance is required and is told that it is." Id. at 631.

The borrower in Maya v. Fleet Consumer Discount Co. (In re Maya), 1990 WL 17351 (Bank. E.D. Pa. 1990), like the Debtor here, was presented with a TILA disclosure statement with a declaration that such insurance was not a requirement, but with elections to purchase insurance prefaced with X's . The borrower signed on the X's, though he was not advised

about and was totally unaware that he had purchased the insurance. Id. at *2. The court rejected the borrower's assertion that the lender affirmatively represented that insurance was required:

> "Debtor, by his own admission . . . merely passively signed a portion of the D/S stating that he would purchase the credit life and disability insurance offered, which was written directly under a portion of the form stating that these purchases were not required . . . There is no claim that the Defendant's agents actively misled the Debtor or his wife . . . nor is there any extrinsic evidence that the insurance was required.

Id. at *3. At best the record before me reflects that Conseco was "pushing" or "recommending" insurance by pre-checking the option to purchase on the TILA Statement and including an insurance application. This does not rise to the level of an affirmative statement or act indicating that insurance is in fact required.

I am disturbed by the two versions of the insurance application with conflicting answers to the medical questions. There is no testimony to rebut Debtor's assertion that the application questions were not asked of him. The only implication is that Conseco or its agents submitted the applications to the insurer without Debtor's input either before or after his signature was obtained on the applications. While the applications certainly raise a question as to possible insurance fraud on the part of Conseco, that is a matter outside the jurisdiction of this Court. However, under Milbourne and Maya the applications do not rise to the level of an "affirmative representation" that insurance was a requirement.

I am not persuaded otherwise by the closing agent's general response "it's for the loan" to Debtor's questioning of the TILA Statement and insurance applications. Debtor could not read, so he could not have been questioning the agent about insurance. Rather it

-12-

appears Debtor was generally asking "what is this?" before signing each document. With respect to the TILA Statement, the closing agent's answer was not inaccurate. The TILA Statement was "for the loan." Indeed, it is a federally mandated form that must be included as part of the transaction. While the agent could have been more specific with regard to the insurance application, once debtor signed the TILA Statement's acknowledgment that he wanted insurance, the insurance applications could be construed as "for the loan." More importantly, I simply do not find the statement "it's for the loan," to rise to the level of an "affirmative representation" that insurance is required.

The clear distinguishing fact here is Debtor's illiteracy. He could not read the loan documents, including the declaration that insurance was not required. His theory is that, <u>because of his illiteracy</u>, presenting the insurance applications and the TILA Statement containing the pre-selected insurance option, along with the closing agent's standard response "it's for the loan" rises to an "affirmative representation" that insurance was required for the loan. However, this argument rests on the premise that Conseco knew, or at least should have known that Debtor could not read. The record before me lacks any evidence to support such a premise.

Debtor admits that he never revealed his illiteracy to Conseco during his phone conversations or at the closing. To the extent that Debtor would like the Court to infer that the closing agent must have realized Debtor's illiteracy from Debtor's questioning of each document, the best evidence on this issue is the Debtor himself who admits that he did not believe the agent knew of his illiteracy. Johnson Dep. at 28-29. This latter admission is significant, as Debtor is the <u>only</u> trial witness identified in the parties' Joint Pretrial

-13-

Case 05-00341-dws   Doc 44   Filed 07/14/06   Entered 07/17/06 10:51:48   Desc Main
Document       Page 14 of 20

Statement who was present at the closing and during the telephone discussion. It is clear that a trial would elicit no further information as to Conseco's knowledge of Debtor's illiteracy or any further fact surrounding the transaction.

In short, the record before me, taken as a whole, could not lead a rational trier of fact to find that Conseco affirmatively represented, by word or deed, that credit insurance was required. The insurance premium therefore was not required to be included in the calculation of the finance charge. As such, no TILA disclosure violation can be proven and the Refinance Loan is not a HOEPA Mortgage subject to the additional disclosure requirements. Summary judgment shall be entered in favor of US Bank on Counts I and II.

B. State Consumer Law Claim (Count III)

In Count III of the complaint, Debtor alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq., sometimes referred to as "UDAP" because the statute prohibits "unfair and deceptive acts and practices." Barber v. Fairbanks Capital Corp. (In re Barber), 266 B.R. 309, 320-21 (Bankr. E.D. Pa. 2001). Debtor's memorandum clarifies that he is alleging a violation of § 201-2(4)(v), which prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have," and the more general "catch-all" provision, § 201-2(4)(xxi), which prohibits "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Debtor's Mem. at 25-26. The UDAP provides a private cause of action to any person "who purchases or leases goods or services primarily for personal, family or

-14-

household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act." 73 P.S. § 201-9.2.

As an initial matter, US Bank correctly notes that it could not have engaged in any prohibited conduct because it was not involved in the loan transaction. Uncontested Facts ¶¶ 26-28. Debtor appears to rely upon a provision of HOEPA, 15 U.S.C. § 1641(d),[7] which has been held to provide liability for other state law claims, including UDAP, against an assignee of a HOEPA Mortgage. See Barber, 266 B.R. at 319-20. However, as the Refinance Loan is not a HOEPA Mortgage, § 1641(d) cannot be used to assert UDAP liability against US Bank as an assignee.

Assuming that US Bank could be held liable under UDAP for the conduct of Conseco and its agent, Debtor agrees that his reliance upon Conseco's conduct is an essential element for a UDAP claim. Debtor's Mem. at 27. More accurately, "'[t]o bring a private cause of action under the [UDAP], a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance.'" Tran v. Metropolitan Life Ins. Co., 408 F.3d 130 (3d Cir. 2005) (emphasis in original) (*quoting* Yocca v. Pittsburgh Steelers Sports, Inc., 578 Pa. 479, 854 A.2d 425, 438 (2004)).[8]

---

[7] Section 1641(d) states in part that an assignee of a HOEPA Mortgage "shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage."

[8] This should not be confused with this Court's holding in In re Patterson, 263 B.R. 82, 91-92 (Bankr. E.D. Pa. 2001), that common law fraud need not be proven to show a violation of the catch-all provision, § 201-2(4)(xxi). Yocca addresses § 201-9.2, which governs a private cause of action for violations of the prohibited conduct enunciated in § 201-2(4).

Debtor asserts that "it was the representation [over the telephone] that the [Refinance Loan] would be better than what he already had that induced him to go along with the [Refinance Loan]." Debtor's Mem. at 25-26; Johnson Dep. at 33 ("They said . . . that they can give me a better loan to pay for the windows").

Preliminarily, Debtor's testimony makes clear that he cannot pinpoint the date of this telephone conversation beyond the six month period following January 9, 2001. His deposition further indicates the Aborted Loan transaction took place on or about January 31, 2001. The Refinance Loan took place on July 16. Debtor simply cannot prove that the alleged telephone discussion with Conseco was with respect to the Refinance Loan as opposed to the Aborted Loan.

Even if the telephone conversation could be connected to the Refinance Loan, "[a] misrepresentation, however, must be distinguished from puffery." Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 103, 337 A.2d 893, 903 (1975). Puffery is "an exaggeration or overstatement expressed in broad, vague and commendatory language." Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993). It is "offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable [person] would rely." W. Page Keeton, Prosser and Keeton on the Law of Torts §109 at 757 (5th ed. 1984). See also Huddleston v. Infertility Center of America Inc., 700 A.2d 453 (Pa. Super. 1997) (finding clinic's representations that it was the "'premier' surrogacy program in the country and that it was designed and implemented to ensure the safety of its [clients]" to be puffery of no legal consequence). A promise of a "better" loan, without more, is mere puffery upon which Debtor could not justifiably rely.

Debtor makes no assertion that Conseco misrepresented over the telephone any specific terms of the Refinance Loan which he now finds "non-beneficial," i.e the interest rate, term of the loan, the total amount he would end up paying, and what debts were being paid off. Pls. Interrog. No. 12.

Debtor further asserts that Conseco's alleged representation that insurance was required violates the UDAP. However, I have already found above that no such affirmative representation was made. Thus I find no misrepresentation of the characteristics of the Refinance Loan that could fall under § 201-2(4)(v) of the UDAP. Moreover, having found that the closing agent had no knowledge of Debtor's illiteracy, I cannot find that the agent's conduct constitutes "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." See 73 P.S. § 201-9.2. Rather it was Debtor's own act of blinding himself to the written disclosures which resulted in his confusion.

The Court, while sympathetic to Debtor's struggle to manage his life without basic reading skills, must administer a law that holds Debtor responsible for his failure to disclose his disability to Conseco or to demand that the documents be read aloud to him or explained in detail:

> If a party, who can read ⋯ will not read a deed put before him for execution; or if, being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which ⋯ is not the subject of protection, either in equity or at law.

Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa.,1983) (citation omitted) (emphasis added); accord North Penn Sanitation, Inc. v. Workers' Comp. Appeal Bd. (Dillard), 850 A.2d 795, 801 n.3 (Pa. Commw. 2004) (persons who are blind or

-17-

illiterate are not automatically excused from complying with the terms of a contract, release or agreement . . . A person with such a disability must make a reasonable effort to have the document read to him.).  Summary judgment shall be entered in favor of US Bank on Count III of the Complaint.

C.  Objection to Proof of Claim (Count IV)

Count IV of the Complaint simply objects to the proof of claim for the Refinance Loan on the basis of his argument under Counts I-III.  As Debtor has failed to demonstrate any triable issue of fact with respect to Counts I-III, summary judgment is warranted on Count IV as well.

An Order consistent with this Memorandum Opinion shall issue.

*Diane W. Sigmund*
_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated: July 14, 2006

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| RODNEY J. JOHNSON, | : | Bankruptcy No. 04-35404DWS |
| Debtor. | : | |
| | | |
| RODNEY J. JOHNSON, | : | Adversary No. 05-0341 |
| Plaintiff, | : | |
| v. | : | |
| GREEN TREE CONSUMER DISCOUNT COMPANY, f/k/a Conseco Finance Service Corporation, U.S. BANK TRUST N.A. as Trustee for Conseco Finance Home Equity Loan Trust 2001-C, | : | |
| Defendants. | : | |

# ORDER

**AND NOW**, this 14th day of July 2006, upon consideration of the Motion for Summary Judgment (the "Motion") of defendant U.S. Bank, N.A., as Trustee for Conseco Finance Home Equity Loan Trust 2001-C ("US Bank"), and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that the Motion is **GRANTED.** Summary judgment is entered in favor of US Bank and against Debtor.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

<u>Copies to:</u>

Harriet L. Hornick, Esquire
Two Penn Center
1500 JFK Boulevard
Suite 1050
Philadelphia, PA  19102

Barbara Kiely Hager, Esquire
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301